2005-NMCA-076

114 P.3d 354

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Nathan VAUGHN, Defendant–Appellant.**

**No. 24,630.**

Court of Appeals of New Mexico.

April 13, 2005.

Certiorari Denied, No. 29,209, June 6, 2005.

Patricia A. Madrid, Attorney General, Santa Fe, Jacqueline R. Medina, Assistant Attorney General, Albuquerque, for Appellee.

D. Eric Hannum, Albuquerque, for Appellant.

## OPINION

FRY, J.

{1} Defendant appeals his conviction for aggravated driving while under the influence of intoxicating liquor or drugs on three grounds: (1) the trial court acquitted him of aggravated DWI during the proceedings and therefore violated double jeopardy protections when it found him guilty later on in the same proceedings; (2) the trial court incorrectly interpreted the applicable statutory provisions on refusal to submit to testing by holding that Defendant refused to comply even though he had provided one breath sample; and (3) it is fundamentally unfair and a violation of substantive due process to admit a breath sample into evidence while also finding Defendant guilty of refusing to provide a breath sample. For the reasons that follow, we are not persuaded by Defendant's first two arguments. We do not reach Defendant's due process argument because it is insufficiently developed. We therefore affirm Defendant's conviction.

## BACKGROUND

{2} Defendant was arrested after failing field sobriety tests and was taken to Bernalillo County Detention Center, where he was asked to provide breath samples approxi-

mately sixty minutes after he had been driving. The arresting officer testified that after Defendant successfully blew the first test, he could see his score of 0.16 and was advised of what his score was. The officer testified that Defendant then took a deep breath and pretended to blow into the machine for a second and third test resulting in readings of "insufficient sample" and "no sample introduced" respectively. The officer testified that the Intoxilyzer breath-test device was working properly, that it had been certified and passed its own internal calibration and diagnostic tests and, finally, that there was no need to replace the disposable mouthpiece since it had worked on the first sample. There was conflicting testimony at trial regarding whether Defendant's actions were intentional. The officer testified that Defendant was argumentative during the testing, and the officer felt Defendant's failure to blow a second sample was intentional. Defendant testified that he neither refused to blow into the device nor refused to follow the officer's instructions, and that he could not hear the officer's instructions due to a hearing impairment.

{3} Defendant was charged with aggravated DWI based on both the breath alcohol content (BAC) score of 0.16, often referred to as a per se DWI violation, and based upon his refusal to provide sufficient breath samples. *See* NMSA 1978, § 66–8–102(D)(1) (2004) (defining aggravated DWI as driving with a BAC of 0.16 or higher); § 66–8–102(D)(3) (defining aggravated DWI as refusing to submit to chemical testing as provided for in the Implied Consent Act if the court determines the person operated a motor vehicle while under the influence of liquor or drugs). Defendant was tried and convicted in a bench trial in metropolitan court (the trial court) on the aggravated DWI charge. In so holding, the trial court noted that after consideration of the testimony, it generally did not find Defendant credible.

{4} During the course of the trial, the trial court made oral and written statements that Defendant contends constituted an acquittal of the refusal basis for aggravated DWI. We discuss these statements more fully below in conjunction with the discussion of double jeopardy.

{5} Defendant appealed to the district court. The district court rejected his double jeopardy and due process claims, and affirmed his conviction on grounds that there was sufficient evidence to find that Defendant had refused to submit to testing and that he had driven while intoxicated in violation of Section 66–8–102(D)(3). The district court concluded that there was insufficient evidence to support a conviction under the per se provision of Section 66–8–102(D)(1) because the State did not produce any corroborative evidence relating the sixty-minute-old 0.16 BAC score back to the time of driving, particularly where the officer testified that the Intoxilyzer device had a 0.02 margin of error. Since the State does not appeal this holding, we do not consider it further. Therefore, the refusal provision of Section 66–8–102(D)(3) is the only basis upon which Defendant's conviction of aggravated DWI can stand. We address the refusal basis after considering Defendant's double jeopardy argument.

## DISCUSSION

### Double Jeopardy

{6} Defendant argues that the trial court acquitted him of the refusal basis for aggravated DWI when it issued oral and written rulings during the course of the trial. Defendant invokes both the United States and New Mexico double jeopardy clauses. U.S. Const.Amend. V; N.M. Const. art. II, § 15; NMSA 1978, § 30–1–10 (1963) (stating that double jeopardy claims are not waived and can be raised at any time before or after entry of a judgment). We conclude that Defendant did not preserve his claims under the state constitution as our case law requires, pursuant to *State v. Gomez*, 1997–NMSC–006, ¶¶ 22, 23, 122 N.M. 777, 932 P.2d 1.

{7} Under *Gomez*, we first consider whether the state constitution has been held to provide greater protection under similar circumstances than the federal constitution. *State v. Lynch*, 2003–NMSC–020, ¶ 13, 134 N.M. 139, 74 P.3d 73. Although our Supreme Court has interpreted our double jeopardy clause more expansively than its

federal counterpart in three situations, no case has applied an expansive interpretation to the acquittal aspect of double jeopardy, the circumstance presented by this case. *Id.* ¶ 15 (giving protection from greater charges for the same conduct after a conviction on lesser charges); *see State v. Nunez,* 2000–NMSC–013, ¶¶ 17–18, 27, 129 N.M. 63, 2 P.3d 264 (holding that, unlike under the federal constitution, a civil forfeiture is punishment under the New Mexico double jeopardy clause); *State v. Breit,* 1996–NMSC–067, ¶¶ 35–36, 122 N.M. 655, 930 P.2d 792 (providing more protection where mistrial is provoked by prosecutorial misconduct). Therefore, in order to preserve a claim under the state constitution, Defendant would have had to raise this claim in the trial court and provide a basis to interpret the state constitution differently. *Lynch,* 2003–NMSC–020, ¶ 13, 134 N.M. 139, 74 P.3d 73. Defendant first raised his claim under the state double jeopardy clause in his appeal to the district court, so that claim is not preserved.

**{8}** Turning to the federal constitution, such claims are reviewed de novo and need not be raised in the trial court to be preserved. *State v. Rowell,* 121 N.M. 111, 114, 908 P.2d 1379, 1382 (1995); *State v. Attaway,* 117 N.M. 141, 145, 870 P.2d 103, 107 (1994); § 30–1–10. Generally, the federal double jeopardy clause has been held to offer three core protections: (1) protection against a second prosecution for the same offense after an acquittal, (2) protection against a second prosecution for the same offense after a conviction, and (3) protection against multiple punishments for the same offense. *State v. Angel,* 2002–NMSC–025, ¶ 7, 132 N.M. 501, 51 P.3d 1155. Defendant in this case is impliedly focusing on the first protection, which is intended to prevent the government from "harassing citizens by subjecting them to multiple suits until a conviction is reached, or from repeatedly subjecting citizens to the expense, embarrassment and ordeal of repeated trials." *Id.* ¶ 15 (internal quotation marks and citation omitted). Jeopardy begins or attaches when the trier of fact is empowered to decide guilt or innocence and jeopardy terminates upon an acquittal, a conviction, or with certain types of mistrial. *County of Los Alamos v. Tapia,* 109 N.M.

736, 737, 790 P.2d 1017, 1018 n. 1 (1990). Since the fact-finder in this case was empowered to find Defendant guilty, jeopardy had attached; our task is to determine when jeopardy terminated, at which point Defendant would be protected from any further prosecution for the same offense.

**{9}** Under the doctrine of double jeopardy, a verdict of acquittal is given "absolute" protection to guarantee finality of that verdict because the defendant's interest in such finality is "at its zenith[.]" *Id.* at 742, 790 P.2d at 1023. Also, "[o]nce an accused is actually, and in express terms, acquitted by a court, the finality of that judgment will not yield to any attempts to dilute it." *Id.* at 741, 790 P.2d at 1022. The United States Supreme Court has said that it is "the most fundamental rule" that a defendant cannot be re-tried after a verdict of acquittal, even if that verdict is egregiously erroneous, *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 571, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977), and that acquittals have "special weight" under double jeopardy analysis. *Tibbs v. Florida,* 457 U.S. 31, 41, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). This Court has recently held that such double jeopardy protection is triggered by a jury verdict of acquittal even if the verdict was issued erroneously and the jury issued a new verdict within a matter of minutes. *State v. Rodriguez,* 2004–NMCA–125, ¶ 14, 136 N.M. 494, 100 P.3d 200, *cert. granted,* 2004–NMCERT–10, 136 N.M. 542, 101 P.3d 808 (explaining that the jury had been discharged after issuance of the verdict and the jury could have been subject to outside influences before being reassembled). After an acquittal, any type of fact-finding proceeding going to elements of the charged offense violates the federal double jeopardy clause. *Smalis v. Pa.,* 476 U.S. 140, 142, 106 S.Ct. 1745, 90 L.Ed.2d 116 (1986); *see Sanabria v. United States,* 437 U.S. 54, 75, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978) (holding that no exceptions permit a retrial once the defendant is acquitted). The Supreme Court has also instructed that what constitutes an acquittal "is not to be controlled by the form of the judge's action. Rather, we must determine whether the ruling of the judge, whatever its

label, actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged" and the focus is on "substance as well as form." *Martin Linen Supply Co.*, 430 U.S. at 571–72, 97 S.Ct. 1349 (internal quotation marks and citations omitted).

{10} Defendant claims that comments made by the trial court during his trial and a written order the judge issued both constituted acquittals. We set out the comments and order in the context in which they were given.

{11} In his closing argument on June 2, 2003, Defendant contended that the breath score alone was insufficient to support a conviction as a matter of law. After the State noted that Defendant was charged in the alternative with refusal, Defendant argued that the per se provision and the refusal provision are mutually exclusive, contending that once a breath score is in evidence it is contrary to logic for the State to claim the Defendant refused to submit to testing.

{12} When the trial court issued its initial decision on June 3, 2003, it stated "Mr. Vaughn, I'm going to find you guilty of the aggravated DWI on the basis of the breath score, *not on the basis of the refusal,* although I do think that alternatively that could have been argued as well." (Emphasis added.) Defendant contends this oral statement operated as an acquittal on the refusal basis for aggravated DWI. The trial court then issued its sentence for that decision, saying, "I'm going to go ahead and sentence your client to the first offender program. There is a mandatory 48 hours associated with the aggravated."

{13} Defendant moved for reconsideration of the decision on the ground that the State failed to adduce testimony relating the breath score back to the time of driving. Defense counsel also mentioned that he had not found any authority specifically on whether a defendant can be guilty of refusal after providing one sample. The trial court agreed to review the relation back issue urged by Defendant and scheduled a hearing on the motion for reconsideration on Friday, June 6, 2003. The trial court stated, "The aggravation I'm going to *support with a sub-*

*sequent order,* which will then at that time, if I do find that, I will order that he turn himself in. . . . And I'll *defer the aggravation,* and consider it on the motion to reconsider on Friday." (Emphasis added.) The trial court also issued a written form titled "Sentencing Order—DWI First Offender Program." The trial court checked the box for Defendant "having been found guilty" of "[d]riving while intoxicated, first offense," although the form does not indicate which statutory provision was violated. The trial court noted on the form that the parties were to return in three days for the "Mo to reconsider Agg." Defendant claims this form was both a judgment of acquittal and a deferred sentence that precluded later imposition of jail time.

{14} Following the hearing on the motion for reconsideration, the trial court rejected Defendant's contention that the per se charge was not supported by sufficient evidence. During this final session, the trial court commented, "I think it's to your client's benefit that I find in this particular case that it was the point one six *as opposed to the refusal* because of the status of his license." (Emphasis added.) Defendant claims this comment also operated as an acquittal of the refusal basis for aggravated DWI. The written judgment filed after this hearing stated, "Aggravation found—Defendant guilty at trial of Agg DWI[.]"

{15} In determining whether any of the trial court's actions constituted an acquittal that terminated jeopardy, we look first to New Mexico law. The general rule in New Mexico is that an oral ruling by a trial court is not final and, with only limited exceptions, it is not binding. *State v. Diaz,* 100 N.M. 524, 525, 673 P.2d 501, 502 (1983) ("It is well established that an oral ruling by the trial court is not a final judgment, and that the trial court can change such ruling at any time before the entry of written judgment."). There are limited exceptions to this general rule, such as for oral declarations of mistrial, *State v. Reyes–Arreola,* 1999–NMCA–086, ¶ 10, 127 N.M. 528, 984 P.2d 775, and the oral granting of a new trial, *State v. Ratchford,* 115 N.M. 567, 570–71, 855 P.2d 556, 559–60 (1993).

{16} Defendant raises two distinctions that he claims preclude the application of the general rule that oral rulings are not binding and that justify application of double jeopardy protection in this case: (1) the trial court issued a written ruling instead of just an oral ruling, and (2) oral acquittals are recognized by other jurisdictions and should be treated differently than oral statements regarding sentencing. We address and reject each contention in turn.

## The June 3, 2003 Order Did Not Constitute an Acquittal

{17} Defendant places great emphasis on the sentencing order issued by the trial court on June 3, 2003, three days before the final judgment and sentence. Defendant argues that this written order puts this case beyond the reach of *Diaz* because in that case our Supreme Court focused on the lack of a filed written judgment. *Diaz*, 100 N.M. at 525, 673 P.2d at 502. Defendant characterizes this order as either a written judgment of acquittal, which precluded the subsequent finding of guilt on aggravated DWI, or as a written deferment of sentence, which precluded the later imposition of a sentence of confinement. The State responds that the sentencing order was a "partial" judgment and sentence.

{18} We agree with the State and conclude that this order was interlocutory and not binding. Both the content of this order and the context in which it was given convince us that it was interlocutory and neither terminated jeopardy nor imposed a sentence upon Defendant. As the State notes, this order was not a final judgment and sentence because it expressly contemplated further proceedings on the issue of aggravation, and therefore did not "dispose[ ] of" all issues of law and fact "to the fullest extent possible" under traditional finality rules. *State v. Candy L.*, 2003–NMCA–109, ¶ 5, 134 N.M. 213, 75 P.3d 429 (internal quotation marks and citations omitted). Although this order was signed and filed, because it expressly continued the proceedings to determine guilt, the trial court had not terminated the proceedings. Looking to the touchstone of *Martin Linen Supply Co.*, we ask if the substance of this order represented "a resolution, correct or not, of some or all of the factual elements of the offense." 430 U.S. at 571, 97 S.Ct. 1349. · If anything, this order was a resolution of guilt of simple DWI and made it clear that the proceedings would continue while the trial court contemplated guilt on the charge of aggravated DWI. Such an interlocutory order, even if written and filed, does not terminate jeopardy because it so clearly was not a resolution of the charge for which Defendant was being tried. This order also does not operate as an acquittal of aggravated DWI under the metro court rules since it is not a judgment of "not guilty" on that charge. Rule 7–701 NMRA ("If the defendant has been acquitted, a judgment of not guilty shall be rendered.").

{19} New Mexico cases address similar circumstances in the context of sentencing. Where a defendant is on notice that the trial court's oral sentence was not final, he has no reasonable expectation of finality. *State v. Rushing*, 103 N.M. 333, 706 P.2d 875 (1985). Double jeopardy considerations "exist to protect a defendant's expectations of finality without providing . . . [him] with the right to know at any specific moment in time what the exact limit of his punishment will turn out to be." *Id.* at 335, 706 P.2d at 877 (internal quotation marks and citation omitted); *see also Angel*, 2002–NMSC–025, ¶ 15, 132 N.M. 501, 51 P.3d 1155 (holding that a defendant's expectations of finality after entering a no-contest plea were outweighed by state's right to a "full and fair opportunity" to convict criminals). Here, where Defendant specifically asked the court to make its order not final by requesting reconsideration, it is inconsistent for Defendant to point to the order as final or to claim he had an expectation of finality in that order.

{20} Defendant also advances an argument that the June 3, 2003 order was final because, under *Diaz*, oral judgments are not final but written judgments are final. Defendant appears to view this as a strictly binary situation—that an order must either be oral and not final or written and final. We disagree because not all written orders are final. *See Smith v. Love*, 101 N.M. 355, 356, 683 P.2d 37, 38 (1984); *State v. Durant*,

2000–NMCA–066, 129 N.M. 345, 7 P.3d 495; *Levenson v. Haynes,* 1997–NMCA–020, ¶ 10, 123 N.M. 106, 934 P.2d 300 (describing a written order as interlocutory and subject to modification or reconsideration by the trial court); *High Ridge Hinkle Joint Venture v. City of Albuquerque,* 119 N.M. 29, 37, 888 P.2d 475, 483 (Ct.App.1994) (stating that a letter is a non-final order or judgment, and that final orders must be formal and contain decretal language). Defendant's logic that the order must be final because it is in writing is strained in this case, where the written document clearly indicates on its face that the proceedings are continuing.

{21} Defendant further argues that this order was an acquittal on the refusal basis for aggravated DWI, apparently under the theory that it somehow finalized or solemnized the trial court's oral comment "guilty of the aggravated DWI on the basis of the breath score, *not on the basis of the refusal,* although I do think that alternatively that could have been argued as well." (Emphasis added.) This argument is speculative since the form simply indicates a determination of guilt for "[d]riving while intoxicated, first offense." It is unclear from Defendant's argument how this initial order operates as an acquittal on the refusal basis apart from simply being "a writing." As noted above, not all writings by a judge are final orders. As Defendant has no persuasive or clear argument on how the June 3, 2003, writing could operate as a final verdict of acquittal, we reject it as being without merit or support in the record.

{22} We also reject Defendant's contention that the June 3, 2003 order imposed a deferred sentence, which would bar any later sentence of confinement under *State v. Lopez,* 99 N.M. 791, 795–96, 664 P.2d 989, 993–94 (Ct.App.1982) (holding that a court has no power to impose jail time as a condition of a deferred sentence). Because this order was interlocutory, it was neither a judgment of guilt on aggravated DWI nor a sentence for that charge. This order, therefore, did not impose a deferred sentence upon Defendant and the trial court was free to impose any authorized sentence, including the forty-eight consecutive hours of confinement, on June 6, 2003.

## Oral Rulings of Acquittal Are Not Binding

{23} Defendant next contends that an oral ruling going to guilt or innocence should be binding because its constitutional gravity is greater than an oral ruling regarding sentencing. He directs us to out-of-state authority holding that oral rulings can terminate jeopardy. *See Lowe v. State,* 242 Kan. 64, 744 P.2d 856, 857–58 (1987) (holding that an oral acquittal terminates jeopardy and bars any further action for that offense). *But see United States v. Wash.,* 48 F.3d 73, 79 (2nd Cir.1995) ("An oral grant of a motion for acquittal is no more than an interlocutory order, which the court has inherent power to reconsider and modify . . . prior to the entry of judgment.") (internal quotation marks omitted) (quoting *United States v. LoRusso,* 695 F.2d 45, 52–53 (2nd Cir.1982)). We are not persuaded and decline the invitation to import such a rule into New Mexico for three reasons.

{24} First, Defendant has not meaningfully distinguished this case from the general rule in New Mexico that oral rulings are ineffective and are not final judgments. *Smith,* 101 N.M. at 356, 683 P.2d at 38 (stating that a written order that is never filed is equivalent to an oral ruling and therefore is not a final judgment); *Diaz,* 100 N.M. at 525, 673 P.2d at 502 (holding that a court is free to change an orally pronounced sentence until a written judgment is filed). The two current exceptions to this rule are not implicated in this case. The *Ratchford* exception is limited to an oral grant of a new trial being effective to defeat automatic denial provisions built into the rules of criminal procedure. 115 N.M. at 570–71, 855 P.2d at 559–60. The cases involving discharge of a jury can be distinguished because in those cases the proceedings were terminated and the fact-finder was discharged by the oral comments of the judge, while here, proceedings were ongoing and the court expressly reserved ruling on the aggravated DWI charge. *Rodriguez,* 2004–NMCA–125, ¶ 14, 136 N.M. 494, 100 P.3d 200 (holding that oral discharge of jury terminated jeopardy);

*Reyes–Arreola,* 1999–NMCA–086, ¶ 10, 127 N.M. 528, 984 P.2d 775 (holding that oral declarations of mistrial which discharge the jury "are unlike other oral decisions by the trial court, which are not binding and are subject to change until a final written order or judgment is entered").

{25} Defendant also makes no argument why finality for purposes of appeal should be different from finality for a criminal verdict in terms of terminating jeopardy. This court has held that "in criminal cases, the judgment is final for the purpose of an appeal when it terminates the litigation on the merits and leaves nothing to be done but [enforcement]." *Durant,* 2000–NMCA–066, ¶ 5, 129 N.M. 345, 7 P.3d 495 (internal quotation marks and citations omitted). We see no reason to differentiate between finality for purposes of a verdict (termination of jeopardy) and finality for purposes of appeal.

{26} Second, permitting oral acquittals would require us to clarify what words used by a trial court would or would not constitute an acquittal—an exercise with serious practical and conceptual difficulties. After surveying cases from other jurisdictions in this area, it is clear that those courts that allow jeopardy to terminate upon an oral ruling have had to make subtle, fine-line distinctions, including: (1) which words are sufficiently final, (2) whether words have hung in the air for long enough to solidify into irrevocable orders, (3) whether parties did or did not reasonably rely on such rulings to their detriment, and (4) whether an interactive dialogue with the court truly communicated an acquittal on the merits. *See generally State v. Collins,* 112 Wash.2d 303, 771 P.2d 350, 353 (1989) (en banc) (concluding that in light of their experience with oral acquittals the superior rule was to only allow a final written order terminating jeopardy); *Barnes v. State,* 9 S.W.3d 646, 649 (Mo.Ct.App.1999) (concluding that when the judge changed her mind on an oral ruling during a few minutes of conversation, jeopardy had been terminated, contrary to the judge's understanding that he was hearing argument).

{27} Discouraging courts from engaging in open dialogue with the parties or forcing judges to constantly issue disclaimers that all oral rulings are tentative and under advisement is not a practical way to guarantee the verdict finality that double jeopardy seeks to protect. We approve of an approach similar to that adopted by Utah and conclude that a bright-line rule rejecting oral acquittals is practical, clarifies the expectations of the parties, and supports the double jeopardy doctrine's protections of verdict finality. *See State v. Gerrard,* 584 P.2d 885, 887 (Utah 1978) (stating that a court could reverse an orally issued sentence without violating double jeopardy and that the appropriate review was for inherent unfairness that constituted an abuse of discretion).

{28} Third, acceptance of the concept of oral acquittals would dilute double jeopardy's core focus on verdict finality with concerns about trial process. Those courts that find jeopardy terminated by oral rulings often slide into concerns about prejudice in the trial process, which is not the focus of double jeopardy doctrine. *See Brooks v. State,* 308 Ark. 660, 827 S.W.2d 119, 123 (1992) (stating that "prejudice is clear" when a defendant is deprived of an opportunity to know the charges against him during trial). In the adversarial and high-stakes dynamic of an ongoing criminal trial, it is understandable that a defendant would seize a favorable statement or decision and seek to freeze such a ruling. This is not the purpose of double jeopardy protection. It is crucial to distinguish between fairness in the trial process and finality in the trial result. Double jeopardy protection is aimed at ensuring finality in the results of a trial, particularly where a defendant is acquitted, so that an acquitted defendant has secure and peaceful "repose." *Tapia,* 109 N.M. at 742, 790 P.2d at 1023.

{29} In New Mexico, the result of a trial, traditionally, is the final written judgment and sentence, and not oral rulings during the trial. *Diaz,* 100 N.M. at 525, 673 P.2d at 501; Rule 7–701 ("[A] written judgment and sentence shall be signed by the judge and filed."). While some courts tend to merge trial prejudice (trial process) into double jeopardy protections (trial result), it is more faithful to the doctrine to differentiate between an acquittal that would terminate

jeopardy (and implicate the highest level of double jeopardy protection) from a judge's management of the process of a trial. An example of a trial process concern is where a judge's oral statements lead a defendant to believe a charge or element of the case is not in play prior to presentation of defense witnesses or argument. Such prejudicial errors during the process of a trial are best dealt with through existing guarantees of fundamental trial fairness, such as the doctrine of fundamental error, and not via double jeopardy doctrine. *See State v. Barber,* 2004–NMSC–019, ¶ 16, 135 N.M. 621, 92 P.3d 633 (explaining that the doctrine of fundamental error acts as a check on the judicial process, and that an error in the trial process that shocks the conscience may require a reversal regardless of the apparent guilt of the accused).

{30} We conclude that neither the trial court's oral comments nor its interlocutory order subjected Defendant to the harassment of a second prosecution after a verdict of acquittal. Therefore, the double jeopardy clause of the United States Constitution was not violated. *Angel,* 2002–NMSC–025, ¶¶ 7, 15, 132 N.M. 501, 51 P.3d 1155.

### The Trial Court's Oral Ruling Did Not Constitute Fundamental Error

██ {31} Defendant's final argument regarding double jeopardy seems to be that he was prejudiced at trial by the oral ruling on June 3, 2003, because he understood the court's oral ruling to be an acquittal of the refusal theory and therefore did not address refusal in his motion for reconsideration. This claim is weak because refusal had been part of the original charge, and Defendant addressed refusal in his case-in-chief when he testified that he had difficulty hearing the instructions given to him and did not refuse to blow into the device. As noted, the factfinder did not find Defendant credible. Defendant also undertook research to find any relevant case law to support his argument on refusal, even after the oral statements by the trial court, and Defendant continued to argue against the refusal basis, both before and after the purported oral acquittals.

{32} As described above, the doctrine of fundamental error is the more appropriate tool to guard against prejudice from oral rulings during trial. In such an analysis, Defendant would have to show that the oral statements by the trial court caused "fundamental unfairness" in his trial. *Barber,* 2004–NMSC–019, ¶¶ 18–20, 135 N.M. 621, 92 P.3d 633 (internal quotation marks omitted). The record here shows there was no prejudice to Defendant because his defense on refusal was not curtailed in fact, nor was his trial fundamentally unfair.

### The Implied Consent Act, the DWI Statutes, and Applicable Regulations

██ {33} Defendant contends the trial court incorrectly interpreted the aggravated DWI statute, Section 66–8–102(D), and the Implied Consent Act, NMSA 1978, § 66–8–107 (1993), when it held that Defendant refused to comply with the test after he had provided one breath sample. We review issues of statutory interpretation de novo. *Rowell,* 121 N.M. at 114, 908 P.2d at 1382; *Bd. of Comm'rs of Doña Ana County v. Las Cruces Sun–News,* 2003–NMCA–102, ¶ 19, 134 N.M. 283, 76 P.3d 36. The primary goal is to ascertain legislative intent, indicated by the plain language of the statute. *Id.* When "the statute's language is clear and unambiguous, we give the statute its plain and ordinary meaning and refrain from further interpretation." *Id.* A statute defining criminal conduct must be strictly construed, *Santillanes v. State,* 115 N.M. 215, 221, 849 P.2d 358, 364 (1993), and agency rules and regulations are construed in the same manner as statutes. *Bokum Res. Corp. v. N.M. Water Quality Control Comm'n,* 93 N.M. 546, 549, 603 P.2d 285, 288 (1979) (applying rules of statutory construction to agency regulations); *N.M. Dep't of Health v. Ulibarri,* 115 N.M. 413, 416, 852 P.2d 686, 689 (Ct.App.1993) (applying rules of statutory construction to administrative agency rules). All portions of statutes are read in connection with every other part to produce a harmonious whole. *Gen. Motors Acceptance Corp. v. Anaya,* 103 N.M. 72, 76, 703 P.2d 169, 173 (1985).

██ {34} The question presented is whether the legislature intended that a driv-

er could provide one breath sample and still be guilty of refusing to comply with the testing regime established by the Implied Consent Act and the implementing SLD regulations. Although this result may seem counterintuitive, we conclude that it was clearly intended by the legislature.

{35} The DWI statute, Section 66–8–102(D)(3), references testing under the Implied Consent Act. § 66–8–107. The Implied Consent Act then refers to the Public Health Act, NMSA 1978, § 24–1–22 (2003), which directs the SLD to establish testing procedures. The SLD has promulgated regulations for alcohol testing of blood and breath pursuant to the Implied Consent Act. 7 NMAC 33.2.1 to –18 (2001).

{36} The DWI statute states, in pertinent part, that a person commits aggravated DWI if he *"refuse[s] to submit* to chemical testing, *as provided for in the Implied Consent Act* ... and in the judgment of the court, based upon the evidence of intoxication presented to the court, was under the influence of intoxicating liquor or drugs." § 66–8–102(D) (emphasis added). The Implied Consent Act then states that any driver in the state has consented "to chemical *tests* of his breath or blood or both, approved by the scientific laboratory division ... pursuant to the provisions of [the Public Health Act] ... for the purpose of determining the drug or alcohol content of his blood if arrested for [DWI]." § 66–8–107 (emphasis added). The SLD regulations contain these definitions:

[A] "sample" [is] a quantity of a subject's blood or exhaled breath to be analyzed for the presence of alcohol.... All *samples* should be of sufficient volume so that complete analysis ... may be performed. The breath test operator should make a good faith attempt to collect and analyze *at least two (2) samples of breath.*

7 NMAC 33.2.7(Q) (emphasis added).

"Test" ... [i]n the case of breath, "test" means the analysis of *breath samples* for alcohol or other chemical substances or both.

7 NMAC 33.2.7(R) (emphasis added).

{37} The definitions portion of the SLD regulations clearly anticipate two breath samples, either expressly or by use of the plural "samples." Similarly, the breath sample collection regulation envisions either two or three samples, yet allows one sample to be analyzed, stating:

(1) *Two breath samples shall be collected* and analyzed by certified Operators.... The *two breath samples* shall be taken not more than 15 minutes apart. If the difference in the results of the *two samples* exceeds 0.02 grams per 210 liters (BrAC), a *third sample* of breath or blood shall be collected and analyzed. If the subject declines or is physically incapable of consent for the *second or third samples,* it shall be permissible to analyze *fewer samples.*

(2) *Samples* of the subject's breath shall be collected and analyzed pursuant to the procedures prescribed by, and employing only devices approved and certified by, [SLD].

7 NMAC 33.2.12(B)(1), (2) (emphasis added).

{38} It is clear from the SLD definitions and procedures that a correctly administered breath test will consist of two samples or, in some cases, three samples. The provision allows analysis of "fewer" samples (one sample) in the case of inability or refusal, but the directive to the operator is clear that two samples are to be collected. It is reasonable to conclude that the requirement for two samples is for greater accuracy, but if only one can be obtained, the process is deemed sufficiently accurate to analyze that one sample. This is in order to allow for effective prosecution of those drunk drivers who will provide only one sample; if the suspect is injured or unconscious the State may obtain a blood sample under the Implied Consent Act. NMSA 1978, § 66–8–108 (1978) (stating that a suspect who physically cannot refuse due to injury, unconsciousness, or death has consented to testing). *See also State v. Munoz,* 2004–NMCA–103, ¶ 5, 136 N.M. 235, 96 P.3d 796 n. 1 ("In New Mexico, a single breath test *consists of two samples* .... If the subject declines or is unable to give two samples, fewer are permitted for a valid test." (emphasis added)).

{39} Defendant contends that the words "[a driver consents] to chemical *tests* of his breath or blood *or both* " in the Implied

Consent Act must be read together with the later-occurring phrase "[a] *test* of blood or breath or both ... shall be administered at the direction of a law enforcement officer." § 66–8–107 (emphasis added). He contends the plural "tests" refers not to multiple samples, but rather to the option of the police officer to seek both blood or breath tests. It would be a counterintuitive reading for the word "tests" to refer not to "breath or blood" yet refer to "both"—had the Legislature intended only one test of each type at the option of the police, it could have easily said "[a driver consents] to a *test* [ ] of his breath or blood or [a *test* of] both." Defendant's reading is also countered by the express language of the SLD regulations which mandates two samples, 7 NMAC 33.2.12(B), and this Court's observation that the word "test" of breath under the SLD regulations actually consists of multiple samples, so the use of the singular "test" does not refer to one sample. *Munoz*, 2004–NMCA–103, ¶ 5, 136 N.M. 235, 96 P.3d 796.

{40} Finally, Defendant argues that because the SLD regulations allow the analysis of a single sample, providing just one sample results in compliance with the statutes and regulations. This runs counter to the language of the aggravated DWI provision that a person is guilty if he "refuse[s] to submit to chemical testing, *as provided for in the Implied Consent Act.*" § 66–8–102(D)(3) (emphasis added). Since the Implied Consent Act references the authority of SLD to define testing, and SLD has clearly defined correct testing of breath as the collection of two samples, providing one sample is not submitting to testing "as provided for" in the Act or as designated by SLD. The plain language of the relevant statutes and regulations indicate legislative intent to motivate suspects to take the test and to punish those who do not take the breath test correctly. § 66–8–102(D), (E) (punishing an intoxicated driver who refuses to submit to chemical testing). Those who provide one sample therefore have refused to take the test as designed by the SLD. The legislature has made it clear that in those cases the single sample can still be used against Defendant. 7 NMAC 33.2.12(B)(1). As noted, here the fact-finder believed the officer's testimony

that Defendant wilfully evaded a second sample, unlike a situation where injury to mouth or lungs could prevent a suspect from providing a breath sample, in which case, presumably, the police would seek a blood sample. *See generally In re Abel G. Suazo*, 117 N.M. 785, 787, 877 P.2d 1088, 1090 (1994) (stating that where suspect had failed to produce enough air for breath sample readings, subsequently blaming injury to his mouth, but later agreed to a blood test, that the later consent did not cure the initial refusal).

{41} Our conclusion is also supported by similar cases in which this Court has held that anything short of full and unequivocal consent is a refusal except in very limited circumstances. *Fugere v. State, Taxation & Revenue Dep't*, 120 N.M. 29, 34, 897 P.2d 216, 221 (Ct.App.1995) (stating that any type of conditional consent is a refusal to take the test, and collecting cases on conditional consent); *In re Abel G. Suazo*, 117 N.M. at 793, 877 P.2d at 1096 (defining a five-part test for when an initial refusal can be cured by a later consent and holding that such consent must be given within a matter of minutes). While criminal statutes must be construed against the State, the plain language of the statutes here indicates the legislature's intent to require that DWI suspects provide two breath samples and that those who, without reasonable justification, provide one sample have failed to take the test "as provided for in the Implied Consent Act." § 66–8–102(D)(3).

## Due Process

{42} Defendant claims it violates the due process clauses of both the federal and state constitutions to convict him of refusing to provide a sample when a sample is used against him. Defendant makes this claim in one sentence without any citation to authority or analysis on how due process was violated by the facts of this case. This Court will not consider an argument that lacks citation to any legal authority in support of that argument. *Santa Fe Exploration Co. v. Oil Conservation Comm'n*, 114 N.M. 103, 108, 835 P.2d 819, 824 (1992); *State v. Chandler*, 119 N.M. 727, 733, 895 P.2d 249, 255 (Ct.App.1995). Where a party cites no au-

thority to support an argument, we may assume no such authority exists. *In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984).

## CONCLUSION

{43}   For the foregoing reasons, we affirm Defendant's conviction.

{44}   **IT IS SO ORDERED.**

ALARID, J., concurs.

ROBINSON, Judge (concurring in result only).